FOR PUBLICATION

FILED
Jun 27 2013, 7:18 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**STANLEY F. WRUBLE III**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TERRY L. STURGIS, SR., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 71A03-1207-CR-330 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable Jane Woodward Miller, Judge
Cause No. 71D01-1111-MR-11

**June 27, 2013**

**OPINION - FOR PUBLICATION**

**BARTEAU, Senior Judge**

Terry L. Sturgis, Sr., appeals his convictions of murder, a felony, Ind. Code § 35-42-1-1 (2007); two counts of criminal confinement, both as Class B felonies; Ind. Code § 35-42-3-3 (2006); eight counts of battery, four as Class B felonies, three as Class C felonies, and one as a Class A misdemeanor, Ind. Code § 35-42-2-1 (2009); and two counts of neglect of a dependent, both as Class D felonies, Ind. Code § 35-46-1-4 (2007). We affirm.

## ISSUES

Sturgis raises six issues, which we consolidate and restate as:

I.      Whether the trial court abused its discretion in limiting Sturgis's cross-examination of a witness.

II.     Whether there is sufficient evidence to sustain Sturgis's conviction for murder.

III.    Whether some of Sturgis's convictions for battery violate Indiana's constitutional protection against double jeopardy.

## FACTS AND PROCEDURAL HISTORY

During the period relevant to this case, Sturgis lived with his mother, Dellia Castile, in the basement of her home in South Bend. Also living in the basement were Sturgis's children, TS1 (son, age fourteen), TS2 (son, age ten), TS3 (son, age eight), TS4 (daughter, age six), and TS5 (son, age four).[1] Several of Castile's other grandchildren lived upstairs.

---

[1] We use numbers because the children have identical initials.

In the early morning hours of November 4, 2011, police, firefighters, and paramedics went to Castile's house in response to a report of an unconscious child. They found Sturgis and TS2, the ten-year-old, near the front door of the house. TS2 was unconscious on the floor. He was not breathing and did not respond to CPR. Paramedics took TS2 to the hospital, and en route they observed numerous burns, bruising, and scars. One of the medics in the ambulance had "never seen anything like" it. Tr. p. 583.

At the hospital, treatment providers discovered that TS2's left arm was broken. He did not respond to efforts to revive him and was pronounced dead. A police officer photographed TS2's body for evidence and observed "in excess of 60 injuries," including severe burns, bruising, and scars. *Id.* at 621.

Subsequent investigation revealed that Sturgis frequently beat TS1 and TS2. He punched them with a closed fist and burned them with heated metal objects, such as a screwdriver, or with roach spray that he ignited with a lighter. TS1 and TS2's cousins heard them screaming in the basement "sometimes every other day." *Id.* at 808. On one occasion, Castile told Sturgis to stop beating his children because "he was going to kill one of them." *Id.* at 809.

On November 3, 2011, the principal of the school TS1 attended called Sturgis and Castile to report that TS1 had stolen pencils. Sturgis went home that evening with a wooden dowel rod that was one inch in diameter and several feet long. He entered the basement, where TS1, TS2, TS3, and TS5 were waiting. Sturgis wrapped one end of the rod in duct tape and told TS1 he "and his stick [were] gonna have some fun." *Id.* at 736. Sturgis ordered TS1 to bend over and pull down his pants. Sturgis hit TS1's buttocks

3

with the rod for ten minutes, and then he wrapped TS1's wrists with duct tape and threw him on the floor. Sturgis continued to hit TS1 with the rod, and when TS1 ripped off the duct tape and tried to stand up, Sturgis hit him on the forehead with the rod, drawing blood. TS1 fell to the floor, and Sturgis sat on him and began to choke him.

At that point, trying to divert Sturgis's attention, TS1 told Sturgis that TS2 had taken one of Sturgis's bottles of water. TS2 denied it, but Sturgis hit him "a lot of times" on the "back and butt and legs" with the rod. *Id.* at 743. Sturgis ordered TS1 to clean up the basement as he continued to beat TS2. Sturgis struck TS2 with the rod for ten minutes, and then he used a heated clothes iron to burn TS2 in multiple locations on his torso, legs, and buttocks.

Next, Sturgis turned to TS3 and said, "[Y]ou're not getting away with anything. You're getting some of this, too." *Id.* at 746-47. He had one of the children's older cousins take TS3 upstairs and hit him on the buttocks with a belt. The cousin stopped when she drew blood and returned TS3 to the basement. When TS3 went back downstairs, Sturgis hit him with the rod, burned him with the iron, and told him to go to bed.

After TS3 went into a sleeping area, Sturgis resumed beating and burning TS2 and TS1, switching from child to child over the course of several hours. Eventually, TS2 sat down and shivered, and he appeared dizzy to TS1. TS2 threw up, and Sturgis continued to beat him while ordering TS1 to clean up the vomit. Next, Sturgis told TS2 to sit on a crate and hold an ice pack to his head, but TS2 was still dizzy and dropped the ice pack twice. Each time TS2 dropped the ice pack, Sturgis beat him and burned him with the

4

iron. On the second occasion, Sturgis also choked TS2 and threw him across the basement.

TS2 could not get up, so Sturgis ordered TS1 to go upstairs and fill a pot with water. When TS1 returned, Sturgis poured the water on TS2's face and told him to get up. He did not respond, so Sturgis stood on TS2's chest for a short time and ordered TS1 to refill the pot of water. Sturgis again poured water on TS2's face and told him to get up. When he did not, Sturgis hit him in the stomach several times and told TS1, "[T]hat's how it feels to get knocked the f**k out." *Id.* at 752.

Sturgis lay down to watch television. TS2 lay on the floor, and Sturgis had TS1 check TS2 several times to ensure that he was still breathing. Later, while TS1 was upstairs, Sturgis discovered that TS2 had stopped breathing. He tried to administer CPR, but TS2 was nonresponsive. Sturgis carried him upstairs, and Castile called 911. Sturgis told TS1 that if anyone asked about TS2's burns, he should say TS2 burned himself while cooking.

A pathologist determined that TS2's death was caused by blunt force trauma, primarily to the head. TS2's brain was swollen to such an extent that it partly extruded from the bottom of his skull. Furthermore, in addition to a broken left arm, TS2 had a broken rib and a fractured coccyx. The pathologist also determined that TS2 had sustained a broken right arm in the past, but it had healed. In addition, a pediatrician examined TS1 and TS3 two weeks after TS2's death, and he discovered multiple scars from burns and whippings on each of them.

5

The State charged Sturgis as follows: Count I, murder, involving TS2; Count II, battery resulting in death as a Class A felony, involving TS2; Count III, battery as a Class C felony, for striking TS1 with the rod; Count IV, confinement, a Class B felony, involving TS1; Count V, battery as a Class C felony, for touching TS1 with a hot iron; Count VI, battery as a Class B felony, for touching TS1 with a heated screwdriver; Count VII, battery as a Class B felony, for striking TS1 on the head; Count VIII, battery as a Class A misdemeanor, for forcing TS1's head into a wall; Count IX, neglect of a dependent, a Class B felony, involving TS1; Count X, confinement, a Class B felony, involving TS2; Count XI, battery as a Class B felony, for touching TS2 with a hot iron; Count XII, neglect of a dependent, a Class A felony, involving TS2; Count XIII, battery as a Class C felony, for striking TS3 with the rod; and Count XIV, battery as a Class B felony, for touching TS3 with a hot iron. At trial, TS1 and TS3 testified for the State. A jury determined that Sturgis was guilty as charged.

At sentencing, the trial court reduced the convictions for neglect of a dependent from Class A and Class B felonies to Class D felonies, citing double jeopardy concerns. The trial court also declined to enter a judgment of conviction on Count II, Class A felony battery, determining that it merged into Count I, the murder conviction. The court sentenced Sturgis to an aggregate term of 140 years. This appeal followed.

6

DISCUSSION AND DECISION

I. CROSS-EXAMINATION OF TS3

Sturgis argues that the trial court limited his cross-examination of TS3, and that the limits violated his federal constitutional right to confront witnesses.[2]

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right to confront witnesses against her or him. *McCorker v. State*, 797 N.E.2d 257, 266 (Ind. 2003). This right is secured for defendants in state criminal proceedings through the Fourteenth Amendment. *Id.* However, the right to cross-examination is not absolute. *Oatts v. State*, 899 N.E.2d 714, 722 (Ind. Ct. App. 2009). The Sixth Amendment does not prevent a trial judge from imposing limits on defense counsel's inquiry into the potential bias of a prosecution witness. *Collins v. State*, 835 N.E.2d 1010, 1015 (Ind. Ct. App. 2005), *trans. denied*. Trial judges retain wide latitude on the scope of cross-examination, and only an abuse of discretion warrants reversal. *Id.*

Here, Sturgis first claims he should have been allowed to ask TS3 whether TS1 molested TS4 and whether TS1 attempted to cover up the molestation. However, during trial Sturgis clearly told the court he did not want to inquire about any molestation. He said at one point, "I have not said one word about anything sexual." Tr. p. 841. Sturgis later said, "[TS3] admitted that there was something improper going on between [TS1] and [TS4]. I didn't ask him what, and I don't intend to." *Id.* at 844. When the trial court asked if the cross-examination was leading to a discussion of whether TS1 molested TS4,

---

[2] Sturgis mentions the Indiana Constitution in passing in connection with this claim. To the extent he raises a state constitutional claim here, it is waived for failure to provide argument and citation to authority.

Sturgis responded, "I'm not going there." *Id.* at 845. Thus, rather than challenge the trial court's determination that questions about alleged molestation were off-limits, Sturgis explicitly declined to cross-examine TS3 on the subject. Therefore, he has waived this claim on appeal. *See Hale v. State*, 976 N.E.2d 119, 123 (Ind. Ct. App. 2012) (determining that a claim was waived due to Hale's failure to contemporaneously object to the trial court's ruling).

Next, Sturgis argues that the trial court improperly barred him from cross-examining TS3 as to whether TS1 had physically abused his siblings and then coerced TS3 to lie about TS1's misconduct. However, Sturgis was, in fact, allowed to cross-examine TS3 on those subjects. Sturgis asked TS3 the following:

> [Sturgis:] Was there some stuff that [TS1] was doing in the house that he didn't want you to tell anybody about?
>
> [TS3:] Say that, again.
>
> [Sturgis:] Was [TS1] doing anything in the house that he didn't want you to tell anyone about?
>
> [TS3:] No.
>
> [Sturgis:] Do you remember him doing some things that he shouldn't have been doing with some of the younger kids in the house?
>
> [TS3:] No.

Tr. p. 839. Next, the court and the parties held a lengthy sidebar, during which the court stated, "If you want to ask [TS3] if he's afraid of his brother, I'll let you ask if he's afraid of his brother . . . ." *Id.* at 844. Sturgis responded, "Well, that's about all my next question was going to be, or we wouldn't be up here." *Id.* He later stated, "[M]y next

8

question is just simply: Did your brother do anything to make sure you didn't tell anybody?" *Id.* at 846-47. The court concluded, "You can ask [TS3] any question you want about whether [TS1] injured him, whether he was frightened by [TS1], whether [TS1] injured [TS2] that night. That's fine." *Id.* at 847.

When cross-examination resumed, Sturgis asked TS3 the following:

[Sturgis:]    I've got to ask you a question, again, about [TS1]. Did he do anything ever to try to make sure that you wouldn't tell anybody about anything that was going on in the house? Did he ever do anything to you?

[TS3:]    No.

[Sturgis:]    I'm sorry, what was your answer?

[TS3:]    No.

[Sturgis:]    Okay. Did he ever hurt you at all?

[TS3:]    No.

[Sturgis:]    Did he burn you with an iron, one time?

[TS3:]    No. But like [sic] he didn't burn me, but I had ran [sic] into the iron.

*Id.* at 848-49. Thus, the trial court permitted Sturgis to cross-examine TS3 as to whether TS1 had abused him or the other children and whether TS1 intimidated TS3 into lying about any abuse by TS1. Sturgis does not identify any other questions on those topics that the court prevented him from asking. We therefore conclude the court did not abuse its discretion in the permitted scope of cross-examination.

9

## II. SUFFICIENCY OF THE EVIDENCE

Sturgis claims the State failed to present sufficient evidence to sustain his murder conviction. When an appellant challenges the sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Joslyn v. State*, 942 N.E.2d 809, 811 (Ind. 2011). We consider only the probative evidence and reasonable inferences supporting the verdict, and we will affirm if the evidence and reasonable inferences could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.*

To obtain a conviction for murder, the State was required to prove beyond a reasonable doubt that Sturgis (1) knowingly or intentionally (2) killed (3) TS2. Ind. Code § 35-42-1-1. A person engages in conduct "knowingly" if, when the person engages in the conduct, he or she is aware of a high probability that he or she is doing so. Ind. Code § 35-41-2-2 (1977).

Sturgis first argues that the State failed to prove that his actions caused TS2's death. He asserts that TS2 could have suffered the fatal injury by falling down the stairs to the basement. This assertion is nothing more than a request to reweigh the evidence. TS2's siblings testified in detail about the severe, extended beating Sturgis inflicted upon TS2. TS1 never saw TS2 fall down the stairs that evening. Furthermore, the pathologist stated that TS2's severe and widespread injuries were inconsistent with a fall down the stairs. This is more than sufficient evidence from which a reasonable trier of fact could have determined that Sturgis's beating caused TS2's death.

Next, Sturgis claims that there is insufficient evidence to prove that he knowingly killed TS2. He acknowledges beating TS1, TS2, and TS3 over a span of several months, occasionally using improvised clubs, and he claims he was not aware of a high probability that his beating of TS2 on the specific night in question would result in death instead of injuries similar to those TS2 had previously sustained. Again, this claim is a request to reweigh the evidence. Castile had warned Sturgis that his beatings would result in the death of one of the boys. Furthermore, it is difficult to credit Sturgis's assertion that he was unaware that repeatedly striking TS2 on the head and torso with a one-inch-thick wooden rod over a span of several hours presented a high probability of death, particularly after TS2 had vomited and exhibited dizziness. Despite these signs, Sturgis continued to beat TS2 and inflict other physical abuse upon him. There is ample evidence from which a reasonable trier of fact could have determined that Sturgis knowingly killed TS2.

## III. DOUBLE JEOPARDY

Sturgis argues that several of his convictions violate his state constitutional protection against double jeopardy. He does not present a claim under the federal constitution.[3]

Article 1, section 14 of the Indiana Constitution provides: "No person shall be put in jeopardy twice for the same offense." Indiana's double jeopardy clause was intended to prevent the State from being able to proceed against a person twice for the same

---

[3] The State contends that Sturgis has waived his double jeopardy claims by failing to provide a sufficient factual basis. We disagree and address Sturgis's claims on the merits.

criminal transgression. *Nicoson v. State*, 938 N.E.2d 660, 662 (Ind. 2010). Two or more offenses are the same offense if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense. *Sloan v. State*, 947 N.E.2d 917, 924 (Ind. 2011). Sturgis presents claims under the "statutory elements" test.

The "statutory elements" test is the same as the analysis required by federal double jeopardy clause jurisprudence. *See Brown v. State*, 912 N.E.2d 881, 896 (Ind. Ct. App. 2009) (asserting that the statutory elements test is identical to the standard set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)), *trans. denied*. Under that analysis, we consider whether each statutory provision at issue requires proof of an additional fact which the other statutory provision does not. *McIntire v. State*, 717 N.E.2d 96, 98 (Ind. 1999).

A. Count III (Battery) and Count V (Battery)

Under Count III, the State charged Sturgis with battery as a Class C felony for hitting TS1 with a deadly weapon on November 4, 2011. Under Count V, the State charged Sturgis with battery as a Class C felony for touching TS1 with a deadly weapon on November 4, 2011. Although these offenses necessarily have the same statutory elements, we reject Sturgis's claim that they violate the statutory elements test. The offenses do not refer to "the same criminal transgression." *Nicoson*, 938 N.E.2d at 662. To the contrary, the counts refer to distinctly separate attacks using different weapons (a club for Count III, a heated clothing iron for Count V). If Sturgis is correct, then the

12

State would never be able to charge a defendant with multiple counts of the same offense arising out of the same incident without violating the statutory elements test, even if the charges referred to separate acts. Therefore, there is no double jeopardy violation. *See Stokes v. State*, 947 N.E.2d 1033, 1038 (Stokes's convictions for possession of a firearm by a serious violent felon, robbery, and criminal recklessness did not violate double jeopardy protections because different weapons supported each charge), *trans. denied*.

Sturgis cites *McGaughey v. State*, 419 N.E.2d 184 (Ind. Ct. App. 1981), but that case is distinguishable. In that case, a panel of this Court determined that McGaughey's convictions for battery violated the federal double jeopardy clause because there were two counts of battery but only one attack. In the current case, Sturgis attacked TS1 multiple times, using at least two different weapons, and the charging information clearly identifies two different weapons. Thus, *McGaughey* does not compel reversal here.

### B. Count XIII (Battery) and Count XIV (Battery)

Under Count XIII, the State charged Sturgis with battery as a Class C felony for hitting TS3 with a deadly weapon (a club) on November 4, 2011. Under Count XIV, the State charged Sturgis with battery as a Class B felony for touching TS3 with a deadly weapon (a heated clothing iron) on November 4, 2011. As was the case in the previous section, these charges do not violate Sturgis's protection against double jeopardy because they refer to distinctly separate attacks involving different weapons. *See Stokes*, 947 N.E.2d at 1038.

## C. Count II (Battery) and Count XI (Battery)

Under Count II, the State charged Sturgis with battery as a Class A felony for beating TS2 on November 4, 2011, in a manner that resulted in TS2's death. Under Count XI, the State charged Sturgis with battery as a Class B felony for touching TS2 on November 4, 2011, with a deadly weapon, specifically a heated clothing iron, which resulted in serious bodily injury. However, although the jury found Sturgis guilty of Count II, the trial court did not enter a judgment of conviction on that charge. The court concluded that Count II "just sits there subsumed by Count I." Tr. p. 1200. Count I was the murder conviction. In the absence of a judgment of conviction on Count II, there can be no constitutional conflict with Count XI. In any event, Count II and Count XI refer to different attacks by Sturgis on TS2 with different weapons. Thus, even if the court had entered judgment on Count II, there would be no double jeopardy violation.

## CONCLUSION

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

FRIEDLANDER, J., and RILEY, J., concur.